IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:00-CV-483-Y |
| | § | |
| MEDICA-RENTS CO., ET AL. | § | |
| | § | Consolidated with |
| and | § | CIVIL ACTION NO. 4:01-CV-198-Y |
| | § | |
| UNITED STATES OF AMERICA | § | |
| *ex rel*. RAMON B. CARTER and | § | |
| MICHAEL STOCKHAM | § | |
| | § | |
| vs. | § | |
| | § | |
| MEDICA-RENTS CO., ET AL. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In his case, the evidence is complicated, but applying the law is simple once the facts are found. In short, the United States is suing a Medicare equipment provider for overpayments that the United States believes it made to the provider. Its theories for recovery are payment by mistake and unjust enrichment. Under neither theory is recovery justified. Accordingly, the Court will grant judgment in favor of Defendants.

## I. PROCEDURAL BACKGROUND

To set the stage for the findings of fact and conclusions of law that follow, the Court must review this case's lengthy and somewhat involved procedural history. On February 17, 1998, relators Ramon B. Carter and Michael Stockham filed a qui tam suit against Defendants[1] in the

---

[1] Defendant Medica-Rents Co. is a Texas partnership that rents durable medical equipment. Defendant Med-RCO, Inc., is a Texas corporation that owns 1% of Medica-Rents and, since January 1996, has been the general partner

United States District Court for the District of New Mexico, alleging violations of the False Claims Act, 31 U.S.C. §§ 3729-32.[2]  Relators claimed that between 1993 and 1995 Defendants over-billed the Medicare program for an anti-bedsore device known as the ROHO Mattress Overlay.  (1 Tr. 73.) The ROHO is manufactured by ROHO, Inc., and supplied by Crown Therapeutics, Inc.  On June 5, 2000, the United States[3] filed a complaint in this Court, alleging various claims against Medica-Rents, including unjust enrichment and payment by mistake.  On February 23, 2001, the United States District Court for the District of New Mexico transferred the relators' suit to this Court. Thereafter, this Court consolidated the relators' suit with the suit filed by the Government, and the Government was granted leave to intervene in the relators' suit.[4]

As might be expected, both the Government and  Medica-Rents filed motions for summary judgment.   Medica-Rents sought summary judgment on all claims brought against it, while the Government sought summary judgment solely on its claims for common-law payment by mistake and partnership liability.  On September 23, 2003, this Court found that Medica-Rents's billing was not false or fraudulent,  Medica-Rents did not knowingly submit false claims, and  Medica-Rents did not act in deliberate ignorance or reckless disregard of the truth.  Thus, Medica-Rents was

---

of Medica-Rents.  Defendant Richard Walsh is a limited partner of Medica-Rents, owns 8.5% of Medica-Rents, and is the president, sole officer, and registered agent of Med-RCO, Inc.  The remaining defendants are limited partners of Medica-Rents.  For the purposes of these findings and conclusions, Defendants will be collectively referred to as Medica-Rents.

[2]  Carter stated that his intent in bringing the qui tam suit was to inflict "maximum damage" on Medica-Rents's Richard Walsh.  (7/26/01 Carter Video Dep. 301-02.)

[3]  The United States will be referred to as "the Government."

[4] Because the Government elected to intervene and take over the relators' action, the relators will receive up to 25 percent of any recovery, together with reasonable attorney's fees, expenses, and costs.  *See* 31 U.S.C.A. § 3730(d) (West 2003); Howard E. O'Leary, *Regulating Health Care Costs Through Fraud Enforcement*, 62 DEF. COUNS. J. 211, 219 (1995).

granted a partial summary judgment on the Government's claims under the False Claims Act. But because there were fact issues on the Government's claims for payment by mistake and restitution under the theory of unjust enrichment, this Court held that Medica-Rents was not entitled to summary judgment on its common-law claims. *See United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742 (N.D. Tex. 2003).[5]

On the parties' motions, this Court granted leave to file additional motions for summary judgment. Medica-Rents filed a second motion for summary judgment and argued that it was entitled to summary judgment as a matter of law on the common-law claims. The Government filed a cross-motion for partial summary judgment. This Court denied both motions and conducted a non-jury trial on the Government's common-law claims in November 2005. *See United States v. Medica-Rents Co.*, Nos. 4:00-CV-483-Y, 4:01-CV-198-Y, 2005 WL 723749 (N.D. Tex. Mar. 29, 2005).

## II. FACTUAL BACKGROUND

Although this Court exhaustively laid out the relevant facts in its 2003 summary-judgment order, the facts will be restated to focus specifically on the Government's common-law claims and to take into account the credible evidence adduced at trial. Much of the explanatory background below comes directly from this Court's 2003 summary-judgment opinion, but is restated here for comprehensibility and completeness. The Court regrets that the alphabet soup that follows is necessary to prevent clutter and reader exhaustion.

---

[5] Although both the Government and Relators filed interlocutory appeals of this order, the Fifth Circuit Court of Appeals stayed the appeals until all related claims are finally disposed of by this Court.

A. MEDICARE, CODING, AND DME

The Medicare program is a statutory creature. *See* 42 U.S.C.A. §§ 1395-1395gg (West 2003 & Supp. 2005). It is administered by the Secretary of the United States Department of Health and Human Services through the Health Care Financing Administration (HCFA), which is now known as the Center for Medicare and Medicaid Services. Part B of Medicare, which is the only part relevant to this case, provides federal government funds to help pay for durable medical equipment (DME) and supplies for Medicare beneficiaries. The Government provides reimbursement for Medicare claims through HCFA. HCFA then contracts with private insurance carriers to administer, process, and pay Part-B claims from the Federal Supplementary Medical Insurance Trust Find. Thus, the carriers act on behalf of HCFA. Before 1993, numerous local Medicare carriers had the responsibility for evaluating and processing DME claims. (1 Tr. 28-29, 87.) Confusion ensued.

In 1993, HCFA, to address this confusion and resultant inconsistency, made DME reimbursement the responsibility of four regional carriers—the Durable Medical Equipment Regional Carriers (the DMERCs). HCFA also created the Statistical Durable Medical Equipment Regional Carrier (the SADMERC) to assist the DMERCs. The SADMERC, to ensure consistency and consensus among the DMERCs, was charged with coordinating their coding decisions. (1 Tr. 77-78.) The SADMERC also gave coding guidance regarding DME-reimbursement claims. This coding guidance, however, had to be the result of the agreement of all the DMERCs. (Def.'s Ex. 1 at MRC0016219; 1 Tr. 58.) When questions arose regarding what the appropriate code was for a particular DME, the DMERCs had the authority to make that decision. (1 Tr. 70; Defs.' Ex. 13.) In other words, the DMERCs had the power to assign codes to DME for billing purposes, and the SADMERC did not have that power. (2 Tr. 93.) Indeed, coding questions for billing purposes were

4

claims-processing issues that the DMERCs were charged with overseeing. (1 Tr. 75.) The DMERCs had the power to make decisions that would allow them to process claims efficiently and to set rates and amounts of payment. (1 Tr. 79.) Thus, in the absence of national guidance from HCFA, the DMERCs interpreted billing codes. (Defs.' Ex. 13.) The DMERC for Medicare Region C, the region relevant here, was Blue Cross/Blue Shield of South Carolina, which did business under the name of Palmetto Government Benefits Administrators. HCFA awarded Palmetto the contract to additionally act as the SADMERC for all four DMERCs. The transition to the SADMERC-DMERC system began in October 1993 and continued into July or August of 1994. (1 Tr. 90.)

To receive reimbursement, a supplier of DME had to provide certain information to HCFA on a HCFA 1500 form, which required the DME supplier to identify its product using a descriptive explanation and a code from a coding system known as the Healthcare Common Procedure Coding System (HCPCS). (1 Tr. 72.) HCFA created HCPCS as an easy way for the supplier to communicate to the carrier what item had been furnished to the Medicare beneficiary. (2 Tr. 55.) HCPCS codes were organized to put structurally and functionally similar products together into categories. Products were assigned codes based upon their characteristics. (2 Tr. 50.) HCPCS was maintained and edited by the HCPCS Alpha-Numeric Editorial Panel, which decides whether a new code should be created for a type of DME product or whether a DME product fit within an existing code. (1 Tr. 36-37.) Within HCFA, a body known as the Alpha-Numeric Workgroup formulated HCFA's policies regarding HCPCS codes and made coding recommendations to the HCPCS Panel. (1 Tr. 37.) The SADMERC was represented in the HCPCS Workgroup, but the DMERCs were not. (1 Tr. 145-46.)

Each HCPCS code used to identify rented DME was assigned a monthly reimbursement

amount on a state-by-state basis.  Each HCPCS code for a DME had a descriptor that described a category of DME products.  DME products with characteristics matching a HCPCS code descriptor were billed to Medicare under that code.  DME with characteristics that did not match the descriptor of a specific HCPCS code were billed using code E1399, which is a miscellaneous code that was used if certain DME did not fall under another code descriptor.  (1 Tr. 32.)  The amount of reimbursement for E1399 DME was based upon the DMERC's analysis of the specific product.  Processing E1399 claims was preformed manually, which resulted in a significant additional workload for the DMERCs.  In other words, processing E1399 claims was burdensome because each claim had to be evaluated individually.  (2 Tr. 74-75; 4 Tr. 140-41.)

## B. MEDICA-RENTS AND THE ROHO

From 1991 through 1996,  Medica-Rents rented ROHOs to Medicare beneficiaries.  The ROHO is a nonpowered, adjustable-zone, pressure-reducing mattress overlay, which is placed on top of a standard mattress.  Low-air-loss products are different from the ROHO because they are powered.  (1 Tr. 44.)  The ROHO qualified for rental reimbursement under Medicare as a "capped-rental" item, which entitled it to monthly payments that were capped after the 15th month of rental if the beneficiary did not take ownership of the DME after the 10th month of rental.  *See* 42 U.S.C.A. § 1395m(a)(7) (West 2003).

In 1991, ROHO, Inc. asked HCFA for a new HCPCS code for the ROHO because ROHO, Inc. believed that there was no existing HCPCS code that applied to the product.  Effective January 1, 1992, the HCPCS Panel added code E0277 for "alternating pressure mattresses."  (1 Tr. 38-39.)  On January 24, 1992, the HCPCS Panel's chairman informed ROHO, Inc. that the ROHO was

already included in code E0197, which descriptor was "air pressure pad for mattress." (Gov't Ex.

1.) Because payments under code E0197 were much less than those under other codes used

previously, ROHO, Inc. objected, stating that E0197 was insufficient to cover the ROHO because

the ROHO had features not offered by a general air-pressure pad for mattress. (Gov't Ex. 2.) On

April 24, 1992, a HCFA official sent a memo to the regional HCFA offices giving guidance on the

appropriate calculation of the fee for E0277 equipment. (Gov't Ex. 3; 1 Tr. 41.) Specifically, the

memo stated that the fee for E0277 equipment was established based on pricing for alternating-

pressure mattresses that included an air pump, which were also known as powered-pressure

mattresses. (Gov't Ex. 3; 1 Tr. 42.) From an internal HCFA memo dated July 27, 1992, it is

apparent that there was confusion within HCFA regarding what code to assign the ROHO. (Gov't

Ex. 8.) The HCPCS Panel decided "to postpone a final decision on this code request pending the

outcome of a meeting" scheduled for August 11, 1992. After that meeting, the HCPCS Workgroup

decided that the existing codes were not appropriate and that the ROHO should be billed under code

E1399 until a new code could be established. (1 Tr. 48, 50.)

   In October 1993, Medica-Rents received several letters from the Louisiana Medicare carrier

stating that the ROHO should be billed under code E0277 "to allow payment." (Defs.' Ex. 4; 6 Tr.

82.) The Texas and Tennessee carriers, however, informed Medica-Rents that it could not use code

E0277 for the ROHO. In December 1993, HCFA sent a draft support-surface policy to the

DMERCs that added a new code—K0155—for "nonpowered adjustable zone pressure-reducing air

mattress overlay, ROHO Dry Flotation or equal." (Defs.' Ex. 9.) Code E0277 was defined as

covering a "powered device." Later that month, HCFA decided to stop the process of promulgating

a support-surface policy because "there has been a non-concurrence from a Bureau component upon

review of the proposed subject policies." (Defs.' Ex. 10.)  Also in December 1993, the SADMERC

informed a supplier of a nonpowered mattress—the RIK[6]—that it should use code E0277 for its

product until the DMERCs could reach a consensus on a support-surface policy.  (Defs.' Ex. 8; 1

Tr. 97-98.)

       During 1994, Medica-Rents billed the ROHO under code E0277 to the DMERC for Region

C, and the claims were paid.[7]  (6 Tr. 83.)  Joel Kaiser, an official with HCFA, testified that after the

transition to the SADMERC-DMERC system, which began in later 1993, HCFA gave no instruction

that code E0277 must be used only for powered products even though it knew that some carriers

were using code E0277 to pay for nonpowered products.  (1 Tr. 85.)  On June 28, 1994, in response

to a complaint from a DME supplier about the overuse of code E0277, HCFA stated that it "cannot

provide a statement of definition of E0277."  (Defs.' Ex. 13.)  In an August 1994 memo to Robert

H. Graebe, the owner and founder of ROHO, Inc., Dave McCausland, the administrative manager

for Crown Therapeutics, memorialized a conference call he had with Medica-Rents's Richard

Walsh.  McCausland expressed concern that Walsh was improperly billing the ROHO under code

E0277 in all the DMERCs.  Walsh did this even though the permission to use that code was given

by local carriers before the complete transition to  the DMERC-SADMERC system.  (Gov.'s Ex.

9.)  On October 21, 1994, a HCPCS coordinator for the SADMERC, Deborah Geddings, contacted

McCausland and stated that the DMERCs would review the information on the ROHO and either

------

       [6]   The RIK, like the ROHO, is nonpowered; however, the RIK is not an overlay and replaces a medical
mattress in toto.  (1 Tr. 98; 285 F. Supp. 2d at 757-58 n.38.)  Both the RIK and the ROHO are classified as Group 2
support surface.

       [7] Medica-Rents included an accurate descriptor, "nonpowered adjustable zone pressure-reducing air mattress
overlay," and the name of the manufacturer—ROHO, Inc.— in submitting its claims on the HCFA 1500 form.  (6 Tr.
85.)

recommend an existing HCPCS code, request a new code, or not recommend a code at all.  Geddings further stated that "[a]ll coverage and pricing concerns should be addressed directly to the individual DMERCs.  The SADMERC will coordinate the coding responses from the DMERCs and respond to you."  (Defs.' Ex. 20.)

In December 1994, the DMERC for Region C began investigating Medica-Rents's submission of claims for the ROHO under code E0277 from September 1 to December 1, 1994.  (2 Tr. 133-34.)  Peggy Walker, a nurse in the Region C DMERC's medical-review department, requested information from  Medica-Rents about the specific properties of the ROHO.  (Defs.' Ex. 21; 2 Tr. 127, 130.)  When sending the information to Walker, Medica-Rents emphasized that it believed it was to bill the ROHO under code E0277 until the new support-surface policy was enacted.  Walker closed the case three months later when she discovered that the Anti-Fraud Unit of the Region C DMERC had begun its own investigation.  (Defs.' Ex. 24.)

In January 1995, Geddings contacted McCausland again and stated that the ROHO was "still under consideration for coding."  (Defs.' Ex. 22.)  On February 21, Geddings wrote McCausland and stated that the DMERCs had decided code E1399 should be used to bill for the ROHO.  (Gov.'s Ex. 13.)  Geddings again asserted that all coverage and pricing concerns should be directed to the individual DMERCs.  Beginning in February 1995, Medica-Rents began receiving denials of its claims for the ROHO under code E0277.  (6 Tr. 83.)  In March 1995, Medica-Rents filed an application with HCFA to add a new billing code that would include products such as the ROHO.  (Gov.'s Ex. 15.)  In the application, Medica-Rents stated that in some regions, they had been assigned code E0277 for billing purposes.  (Gov.'s Ex. 15 at MRC005690.)

In April 1995, Medica-Rents stopped using code E0277 and began to bill for the ROHO

under code E1399 after it found out about Geddings's February 21 letter.  (6 Tr. 83-84.)  In an apparent effort to comply with the shifting coding instructions it was receiving, Medica-Rents resubmitted under code E1399 over 1,700 open claims that had been put in "query suspense" based on Walker's early 1995 investigation.  (Defs.' Ex. 35.)  When billing, Medica-Rents continued to include the descriptor "nonpowered adjustable zone pressure reducing air mattress overlay" and included the name of the manufacturer—ROHO, Inc.  (6 Tr. 85.)   Nevertheless, the claims continued to be unpaid.  (6 Tr. 84-86.)  A factor complicating payment was that code E1399 was not a code that was properly used with capped-rental items such as the ROHO.  (3 Tr. 53.)  Medica-Rents persistently contacted the DMERC for Region C through its professional-relations department to inquire why the claims were not being paid.  (6 Tr. 84-85.)  The members of this department, known as ombudsmen, were aware of the status and various permutations of the not-yet-enacted policy for support surfaces.  (4 Tr. 126-27.)  Further, the professional-relations department could have consulted the SADMERC at any time with questions about this issue.  (4 Tr. 136-37.)

On April 21, a supervisor in the professional-relations department, Elaine Myers, told Medica-Rents that the ROHO could not be billed under code E1399 because it was a capped-rental item.  (Defs.' Ex. 35.)  Medica-Rents promptly faxed to Myers a copy of Geddings's February 21 to the contrary (informing that code E1399 should be used to bill the ROHO).  (4 Tr. 147.)  In response, Sherietta Thompson, the Region C DMERC's ombudsman for Texas suppliers, told Medica-Rents that they were working on the claims and that "everything should be ok" with code E1399. (Defs.' Ex. 35.) Throughout April and into June, Medica-Rents had multiple conversations with the professional-relations department, including Thompson.  (Defs.' Ex. 35.)

On May 18, the Health Industry Manufacturers Association (HIMA) sent a letter to the four

DMERCs requesting quick finalization of the support-surfaces policy and pointing out the code confusion:

> [T]he lack of a policy is having a severe impact on the wound care community. Over the past six months, there has been a change in verbal instructions from the SADMERC on appropriate codes to use for the billing of low air loss products. Previously, local carriers had instructed providers and manufacturers to use E0277; however, we are now told that E1399 is the appropriate code to use.
>
> . . . .
>
> We have grave concerns over the dramatic shift in direction of coding these products. First of all, there is confusion and frustration on the part of both manufacturers and suppliers since there is not a verbal consensus by HCFA, the SADMERC or the DMERC staff on whether to use 1399 or E0277 to bill these products. (Gov.'s Ex. 19.)

On June 13, Medica-Rents sent a letter to Thompson, complaining that the claims submitted under E1399 were still unpaid. (Defs.' Ex. 38.) Medica-Rents sent a copy of this letter to Myers, Thompson's boss. On June 15, representatives of the SADMERC, the HCPCS coordinators for the DMERCs, and Nancy Schmidt of HCFA's Dallas Regional Office held a conference call to discuss the problems with code E0277. (Defs.' Ex. 36; Gov.'s Ex. 21.) The next day, on June 16, the SADMERC's Geddings, along with Laura Godfrey, the manager of the SADMERC's HCPCS department, issued a memo to the HCPCS coordinators for the DMERCs, setting out the decision reached at the June 15 conference call:

> <u>Support Surfaces</u> - E0277 vs E1399 - Per a morning conference call with the DMD's and HCFA CO a decision was made to <u>allow</u> those manufacturer's/suppliers who have been filing their <u>low air loss</u> product under E0277 to continue to do so.
>
> Secondly, those manufacturers/suppliers who have been told to file E1399 may begin using E0277 for <u>new</u> patients claims. The DMERCs will not accept requests for adjustments for previously filed claims under E1399 even if the claim was denied.
>
> Lastly, <u>new</u> inquiries should be told of the dilemma and advised they have a choice to file using either code.

11

It is <u>critical</u> that staff at the DMERCs, HCFA and SADMERC follow this same script.  (Gov.'s Ex. 21) (Emphases in original).

On June 19, Deborah Harrington, one of Godfrey's employees in the SADMERC's HCPCS department, sent an internal memo to the staff of the SADMERC's HCPCS help line restating the policy as set out in the June 16 memo and informing that "Low Airloss Mattresses and Overlay Products" should continue to fall under code E1399 if the provider previously filed claims under that code.  (Gov.'s Ex. 22; 2 Tr. 64.)  Two days later, the HCPCS Workgroup of HCFA decided to defer any decision on how to properly code the ROHO or whether to create a new code for the ROHO until the support-surfaces policy was completed.  (Gov.'s Ex. 24, 29.)  On June 23, the SADMERC's Geddings told Medica-Rents that E1399 was the correct code for the ROHO.  (Gov.'s Ex. 25.)

On July 11, 1995, a policies-and-procedures (PAP) meeting was held at the Region C DMERC to resolve some billing and claims-processing issues, including the E0277 coding problem:

> Elaine Myers advised of a problem with a supplier trying to bill a low air loss overlay and the problems of how to code them.  After some discussion, and review of the June 19, 1995 memo from Debra Harrington that was handed out, the decision was made to advise the supplier to use E0277, while at the same time or during the policy creation, attempt to secure a new code for the low air loss overlay/mattress.
>
> **Action** Pat Smith will request SADMERC to run reports to identify suppliers who may be double billing (using E0277 and E1399) for the same item.  For now, we will use E0277 for the low airloss overlays and if they are billed at E1399, we will change the code to E0277 in order to catch duplicates and to pay maintenance. (Gov.'s Ex. 27.)

Over the next few days, a flurry of e-mails about the ROHO and code E0277 was exchanged between members of the Region C DMERC and the SADMERC.  Myers sent an e-mail to the processing department of the Region C DMERC requesting that the hold on Medica-Rents's claims be deactivated based on the PAP decision to "correct" claims and process them under code E0277.  (Defs.' Ex. 49; 2 Tr. 136.)

12

Walker responded to Myers, complaining that the ROHO did not fall under the PAP decision or the June 16, 1995, SADMERC memo because the ROHO was not a low- air-loss product and was, consequently, nonpowered.  Thus, she insisted, Medica-Rents should bill under E1399, which would cause each claim to be manually processed.  (Defs.' Ex. 49; 2 Tr. 137-38.)  Walker clearly explained in her e-mails the properties of the ROHO.  (2 Tr. 139, 141.)  Walker sent copies of these e-mails to the SADMERC's Godfrey.  (2 Tr. 53.)  Robin Robertson, who was the director of the professional-relations department of the Region C DMERC and Myers's boss, sent an e-mail to her supervisor, Ann Archibald, and Walker's supervisor, Pat Smith, stating that the SADMERC "agrees they instructed suppliers to use E0277, then E1399, and now E0277" since June 19, 1995.  In contradiction of Walker's continued position that Medica-Rents must use code E1399 for the ROHO, Robertson emphasized that only the SADMERC had jurisdiction over "code usage instruction."  (Defs.' Ex. 49; 2 Tr. 145.)  Walker then e-mailed Smith and Godfrey suggesting that Medica-Rents should be given a temporary capped rental code to alleviate the "processing nightmare" that arose with using code E1399.  (Defs.' Ex. 49; 2 Tr. 147.)  Walker stated that she believed that this was a processing problem, not a coding problem, and reiterated that the DMERCs had agreed in February that E1399 was the appropriate code.  (Defs.' Ex. 49; 2 Tr. 147, 151.)  A few days later, Godfrey e-mailed Walker and stated that the SADMERC will not assign capped rental codes because such an issue is a payment category, which presumably is left to the individual DMERC's discretion.  (Defs.' Ex. 49; 2 Tr. 152.)  Walker responded and summarized her understanding of the June 19 internal memo, which called for Medica-Rents to use code E0277 for new patient claims only, but agreed to remove the hold on Medica-Rents's claims.  (Defs.' Ex. 49; 2 Tr. 153.)  Myers was aware that the SADMERC previously told  Medica-Rents to use code E1399

for the ROHO.  (4 Tr. 140.)

On July 18, the day after the hold was removed, Thompson sent "final billing instructions" to Medica-Rents authorizing code E0277 for the ROHO:

> As a result of this meeting [the July 11 Region C DMERC's PAP meeting], it has been determined by [the Region C DMERC] in accordance with the SADMERC that the Low Airloss Mattresses and Overlay products should be coded using HCPCS code E0277.  Therefore, effective immediately you may revert to using code E0277 when billing for the nonpowered[8] adjustable zone pressure-reducing air mattress overlay. . . . These instructions supersede any previous billing instructions provided by [Region C DMERC] staff.
>
> . . . .
>
> As of July 13, 1995, the approximately 1600 [unpaid] claims were adjusted.[9]  (Gov.'s Ex. 28.)

Thompson sent a copy of the letter to Sue Pearcy, who was with the Dallas Regional Office of HCFA.  Thompson would not have sent the letter without direction from her supervisors or direction from the SADMERC at some point.  (2 Tr. 90; 3 Tr. 60.)  When Medica-Rents received this letter, it began to bill under code E0277, and the claims were paid.  (6 Tr. 86.)  On August 4, Thompson sent a second letter to Medica-Rents reiterating that the ROHO should be billed under code E0277 even though it had been previously instructed to use code E1399.  (Defs.' Ex. 95.)  As Myers and Thompson testified, if these letters had been mistaken, they subsequently would have been corrected.  (3 Tr. 63; 4 Tr. 128.)  The letters were never altered, withdrawn, or amended, and there was no evidence that anyone involved was ever reprimanded or disciplined for the contents of the letters.  (3 Tr. 42.)

---

[8]  Thompson testified that she knew the ROHO was a nonpowered overlay when she wrote the letter.  (3 Tr. 59.)

[9]  Thus, the DMERC changed Medica-Rents's claims that were submitted under code E1399 to code E0277. (4 Tr. 165.)

In late 1995, the DMERCs promulgated a new support-surfaces policy, with an effective date of January 1, 1996, to be used to process claims as of April 1, 1996.  On January 8, 1996, Godfrey wrote a letter to Medica-Rents explaining the new policy:

> This letter is to confirm that a new code [K0413] is being established effective April, 1996.  The new code description is:
>
> ### Nonpowered adjustable zone pressure-reducing air mattress overlay
>
> This code will be a Group 2 support surface with regards to DMERC policy.  The code will be published and additional information will be provided in the March/April DMERC bulletins.
>
> The ROHO Dry Flotation Mattress System will be appropriately billed using this code [K0413].  At this time, the product is appropriately billed using the miscellaneous code, E1399 - *Durable Medical Equipment*, Miscellaneous.  Claims received on or after January 1, 1996 will be processed and reviewed according to the Pressure Reducing Support Surfaces - Group 2 policy recently published by the DMERCs.  (Gov.'s Ex. 32 & 33; 1 Tr. 39; Gov.'s Ex. 61 at E-11; Defs.' Ex. 69 at MRC0017328.)

On April 1, 1996, Medica-Rents began billing for the ROHO under code K0413.

In early 1996, the Anti-Fraud Unit of the Region C DMERC began investigating Medica-Rents and the payments it received for the ROHO by billing under code E0277.  (3/26/02 Shivar Dep. 47-48, 70, 76-77.)  Audry Shivar had primary responsibility for the case under the supervision of a senior investigator.  (3/26/02 Shivar Dep. 48-49.)  During her investigation, Shivar contacted Geddings at the SADMERC, who told Shivar that E0277 was an appropriate code for the ROHO before the promulgation of the support-surfaces policy.  (3/26/02 Shivar Dep. 85-86, 159.)  Thompson's July 1995 letter was not a part of Shivar's investigatory file.  (3/26/02 Shivar Dep. 92-93.)  Shivar decided, based on the information she collected on Medica-Rents, not to seek overpayment; thus, she closed the case.  (3/26/02 Shivar Dep. 71, 80.)  Shiver's supervisor, Don Schmadel, stated that nothing he had seen since Shivar's decision not to seek overpayment from

Medica-Rents caused him to rethink or question her conclusion.  (3/27/02 Schmadel Dep. 23.)


## III. DISCUSSION

As previously stated, the Government is seeking to recoup what it believes to be overpayments made to Medica-Rents based on the difference between what they received under code E0277 and what they would have received under code E1399.  After suffering summary judgment against its other claims, the Government's remaining theories of recovery are payment by mistake and unjust enrichment.  There is law to suggest that because unjust enrichment applies in cases where there is no contract and payment by mistake applies in contractual situations, they are mutually exclusive remedies.  *See, e.g., United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1316 (W.D. Okla. 1998).  This Court previously ruled that there was no contract between the parties.  *Medica-Rents Co.*, 285 F. Supp. 2d at 777.  Relying on this holding, Medica-Rents argues that the Government cannot proceed under payment by mistake and is limited to an unjust-enrichment claim.  Although this argument is compelling, the Court is reluctant to foreclose the Government's payment-by-mistake cause of action when it has been allowed in similar cases.  *See, e.g., United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970); *cf. United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 606-09 (8th Cir. 1999) (holding Government could recover under unjust enrichment even though contract existed between Government and Medicare provider).  Further, because, as discussed below, the Government is not entitled to recovery under either theory, it is not necessary to decide this issue.


### A. PAYMENT BY MISTAKE

To prove payment by mistake, the Government must show that (1) payments were made, (2) under the belief that they were properly owed, (3) that belief being erroneously formed, and (4) the mistaken belief was material to the decision to pay. *Medica-Rents*, 285 F. Supp. 2d at 776. A mistake is defined as "[a]n error, misconception, or misunderstanding; an erroneous belief." BLACK'S LAW DICTIONARY 1022 (8th ed. 2004). An error is defined as "[a]n assertion or belief that does not conform to objective reality." *Id.* at 582. If the Government made the payments to Medica-Rents under code E0277 under an erroneous belief that was material to the decision to pay, it is entitled to recover the overpayments. *See United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970).

But the Government's case fails on the element of mistake or error. There was no misconception or misunderstanding that did not conform to the objective reality as known by HCFA, the SADMERC, and the DMERC for Region C. Everyone knew all material and relevant facts about the ROHO when the letter directing use of code E0277 was sent to Medica-Rents on July 18, 1995. Indeed, the properties of the ROHO and its billing problems were exhaustively discussed before the letter was issued. Representatives from the SADMERC and the DMERC HCPCS coordinator were involved in these discussions. Further, a copy of the July 18 letter was sent to a HCFA representative. The letter was never corrected or withdrawn. The evidence shows that it would have been if it had been a mistake.

For six months, Medica-Rents was not getting paid for providing hundreds of expensive ROHOs. The DMERC recognized this as a substantial problem. In determining the source of the problem, the DMERC discovered that the billing code Medica-Rents was using for the ROHO—E1399—could not be used to bill for a capped rental item. Further, the administrative

17

nuisance caused by using E1399 was a factor in the nonpayment. To facilitate payment, the DMERC, which had total billing authority, told Medica-Rents to use code E0277 for payment purposes. The DMERCs had the sole responsibility to assign codes for billing purposes and to make decisions that foster efficient claims processing. The preponderance of the evidence proves that the payment of Medica-Rents's claims for the ROHO was a billing issue and not purely a coding issue. As such, the DMERC was authorized to give guidance on appropriate coding for billing purposes.

Even if the issue were purely one of coding that required HCFA guidance, there is still insufficient credible evidence of a mistake or error. HCFA issued coding guidance for the ROHO in 1992 and directed that it should be coded as E1399 until a new code was established under the pending support-surfaces policy because the existing codes were not appropriate for the product. However, after the transition to the SADMERC-DMERC system began in 1993, HCFA offered no written guidance regarding code E0277 and nonpowered products.[10] This system gave the SADMERC and DMERCs specific duties that were not similarly assigned before the transition. In the absence of such guidance, the DMERCs have the authority to interpret HCPCS codes, which is what the Region C DMERC did when it advised Medica-Rents to bill under code E0277.

## B. UNJUST ENRICHMENT

Likewise, the Government has not proven unjust enrichment. Unjust enrichment is an equitable theory of recovery. Courts should incorporate state law into federal common law in determining a cause of action governed by general principles of fairness such as restitution based

---

[10] Indeed, HCFA figuratively threw up its hands when it continued to delay the support-surfaces policy and stated it could not give a definition for E0277. Inferentially, HCFA was deferring to the interim decisions the DMERCs and the SADMERC were making regarding billing and support surfaces.

on unjust enrichment.  *Applied Pharmacy*, 182 F.3d at 606.  With a claim of unjust enrichment, a plaintiff seeks return of a benefit conferred on another whose retention of the benefit at the plaintiff's expense would be unconscionable.  In other words, recovery under unjust enrichment is justified when one person obtains a benefit from another by fraud, duress, or the taking of an undue advantage.  *Heldnefels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).  Unjust enrichment is not a proper remedy simply because it is apparently easy or fair that the recipient pay some restitution for the payor's unfortunate loss or because the benefits to the recipient amount to a windfall.  *Id.* at 40.

As discussed above, there was no mistake or error in the DMERC's decision to direct Medica-Rents to bill and allow payment for the ROHO under E0277.  All facts were known and all interested parties knew exactly what was occurring with regard to the ROHO.  In the absence of any mistake or error, it is impossible to conclude that the preponderance of the evidence shows that Medica-Rents was paid through its use of fraud, duress, or the taking of undue advantage.  This is especially true in light of the fact that Medica-Rents billed a Group 2 product under a Group 2 code after the entity responsible for billing (and coding in the absence of HCFA guidance) told Medica-Rents to use that code.  The decision to pay for the ROHO under code E0277 was the result of a painstaking deliberative process by the DMERC and SADMERC with HCFA input.  Although Medica-Rents strenuously lobbied for assignment of code E0277 (or a new code) to the ROHO, there is no evidence that Medica-Rents engaged in coercion or took undue advantage when dealing with these officials.  Indeed, even without knowledge of Thompson's July 1995 letter, the Anti-Fraud Unit of the DMERC decided not to seek overpayment.

IV. CONCLUSION

Although there is evidence that Medica-Rents was told early on to use code E1399 to bill the ROHO rentals, the Government nevertheless withheld payment under that code. After careful consideration, the Region C DMERC, with SADMERC input and notice to HCFA, decided to allow Medica-Rents to use code E0277 for the ROHO. It decided this, not because the ROHO necessarily fell squarely within the appropriate criteria for this code, but because there was no other way to ensure fair and timely payment to Medica-Rents for the rentals of the ROHO. The preponderance of the credible evidence proves that the Region C DMERC knew exactly what it was doing when the 1995 letters were sent to Medica-Rents. There was no mistake or error in the letters, so, not surprisingly, they were never corrected. Because it had the power to resolve billing issues and because HCFA had given the DMERCs no guidance on codes for the ROHO, the Region C DMERC was well within its authority to send the letters. The Government's attempt now to cast the issue as a pure coding problem that only HCFA could solve, which HCFA repeatedly declined to do until the support-surfaces policy was finally promulgated in late 1995, or to narrowly define "mistake" as something that is, in hindsight, displeasing, cannot support its recovery. Thus, Defendants are entitled to judgment that Plaintiffs take nothing by their suits.

Defendants request an award of attorneys' fees. By statute, they are arguably entitled to them. *See* 31 U.S.C.A. § 3730(g) (West 2003). On or before March 3, 2006, Defendants shall submit the appropriate application setting forth the statutorily required information and proffering argument regarding whether the Government's position was substantially justified. *See* 28 U.S.C.A. § 2412(d) (West 1994 & Supp. 2005). Any objection to the application must be filed by the Government no later than 20 days after the application is filed. The Court then will enter an order

awarding fees, if any are deemed appropriate, based on the record and the parties' pleadings on this issue.  *See id.* § 2412(d)(1)(B) & (C); FED. R. CIV. P. 58(c)(1).

SIGNED January 31, 2006.

TRM/ah

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE